# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 7, 2006

## JOSEPH W. WILSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-04-249     Roger A. Page, Judge**

---

**No. W2006-00685-CCA-R3-PC  -  Filed April 26, 2007**

---

A Madison County jury convicted the petitioner, Joseph W. Wilson, of three counts of aggravated rape and one count each of attempted second degree murder, especially aggravated robbery, especially aggravated burglary, conspiracy to commit aggravated burglary, and misdemeanor vandalism committed in 1999.  He was sentenced to 71-years' confinement.  In 2005, he filed a post-conviction petition requesting DNA testing pursuant to the Post Conviction DNA Analysis Act of 2001.  The court denied the petitioner's post-conviction petition, and on appeal he contends that the post-conviction court erred by denying his petition.  After thoroughly reviewing the record and the applicable law, we conclude that there is no reversible error in the lower court's judgment.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Joseph W. Wilson, pro se, Appellant.

Robert E. Cooper, Jr., Attorney General & Reporter; David H. Findley, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Alfred Earls, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

As set forth in this court's opinion on direct appeal, the proof at the petitioner's trial established the following facts:

> During the early morning hours of Saturday, November 27, 1999, the seventy-year-old victim awoke when intruders entered her home.  The victim identified the intruders as the defendant and Jason White.  She stated the defendant instructed her to get out of bed.  She said that when she complied, the defendant placed a knife to her

throat and walked her down the hall into the den, where he asked her for money. She testified that after the intruders took six dollars from her purse, the defendant took her into a bathroom and sat her on the commode.

The victim stated the intruders tied her hands behind her back with a towel. She said the defendant placed his penis in her mouth and threatened to cut her throat if she did not perform fellatio. The victim testified that when she did not perform to the defendant's satisfaction, he then threw her to the floor, removed her clothing, and inserted his penis into her vagina. Her vagina was torn and required stitches.

According to the victim, the defendant then pulled her off the floor and struck her head against a wall. The victim stated the defendant "rant[ed] and rav[ed]," and called her a "whore" and a "bitch." She testified the defendant again placed his penis back into her mouth, threatened to cut her throat if she did not perform fellatio, and kicked her. The victim testified she asked the defendant why he was doing this, and he replied, "Because you didn't have much money."

The victim stated that during the rapes, White kept telling the defendant, "We need to go." She said that when White had a question about the rifles in her gun cabinet, the defendant went out of the bathroom and gave instructions on which guns to take. She said the intruders asked her for her car keys, and she told them they were by the back door.

She testified that before the intruders left, the defendant cut her throat and said, "Now, bitch, I guess you'll call the police." She stated she felt blood gushing but lay still and pretended to be dead. After the intruders left, the victim fled to her daughter's nearby home, where her daughter and son-in-law obtained emergency assistance for her. The victim was transported to the hospital, where doctors performed surgery to repair the huge, gaping laceration to her throat and the laceration in her vagina. Miraculously, the victim survived.

According to the victim, the intruders took the cash from her purse, rifles, diamond rings and other jewelry, and her white 1991 Cadillac Seville. She testified they also broke the lock on her gun cabinet.

-2-

The victim stated she only saw two intruders, whom she identified as the defendant and White. She said that at one point, the defendant instructed White to guard the bathroom door while the defendant left the bathroom. She said the defendant also told White to "gather up stuff." She testified both the defendant and White were carrying knives, but that White never entered the bathroom and never touched her.

Jason White testified that on the night of the offense he, the defendant, Brandon Taylor, and Rodney Smith were riding in Taylor's car searching for a house to burglarize. White stated they chose to enter the victim's house because there was no car in the driveway. He said all of them except Taylor, who was driving, exited the car and approached the victim's house. White indicated Taylor was to drive up and down the road and wait on them, but instead left. White testified that he, the defendant, and Smith entered the victim's home after Smith kicked in the front door. White stated that he and Smith exited the house immediately after they heard the victim ask, "Who are you?"

According to White, when he and Smith went outside, Taylor's car was gone. White said he and Smith were standing in front of the house when the victim stepped outside, and the defendant pulled her into the house. White testified he and Smith reentered the house after the defendant told them to come in and "get everything." White said the defendant sat the victim on the commode in the bathroom and told White to stay with her while he found something to bind her. White stated he remained outside the bathroom. White testified the defendant returned with something that appeared to be a white scarf and used it to tie the victim.

White stated he then went into a bedroom, where he took some jewelry and then went into the hall, where he and Smith took several guns. White said he and Smith told the defendant it was time to leave. White testified that while the defendant was in the bathroom, he heard the victim say, "Please don't do this," and "What do you want?" White stated that the defendant cursed the victim and used a loud, mean tone of voice. According to White, the defendant asked him if he "wanted some," apparently inquiring if White wanted to have sex with the victim; White said he refused and indicated they should leave. White testified the defendant said, "Well, I'm going to cut this bitch's throat." White stated he again encouraged the

-3-

defendant to leave. White said he and Smith went outside, and the defendant exited behind them.

White testified they found a white Cadillac in the garage, and he and the defendant reentered the house to find the keys. White said the defendant walked down the hall, kicked the victim, and yelled, "Bitch, where are your f--king keys at?" White testified the defendant then told him the car keys were by the back door. White stated that after he found the keys, he walked down the hall and saw the victim on the floor with her head tilted back and blood on her throat. According to White, after they exited the house, the defendant told him he cut the phone lines so the victim would not call the police.

White said he, the defendant, and Smith left in the Cadillac. White testified he saw a knife blade in the defendant's hand as they drove off; he described the blade as "squiggly" and "then straight at the end." White admitted he also had a knife, but stated he did not use it on the victim. White said they then met Taylor, who accompanied them to an unoccupied house where the defendant used the knife to cut a window screen. White testified that they entered the house through the window, took money, and left.

Brandon Taylor testified that he was in his car with the defendant, White, and Rodney Smith when they chose the victim's house as a target for a burglary. Taylor stated he pulled into the driveway, the others exited the car, and he left.

Rodney Smith testified Taylor drove him, the defendant, and White to the victim's home where all of them except Taylor exited the vehicle with the intent of breaking into the house and stealing property. According to Smith, they planned for Taylor to drive up and down the road and wait for them to return to the car. Smith stated he saw the defendant carrying a knife as they approached the house. Smith stated he, the defendant, and White entered the house. Smith said he broke into a gun case and was gathering rifles when he heard the victim ask, "Who's there?" Smith testified he then ran out of the house and into the front yard while carrying the rifles.

Smith stated he was crouched down near bushes in front of the house when the victim walked out of a door, and then someone escorted her back inside. Smith testified he briefly reentered the house; told the defendant and White, "Come on, let's go;" and exited. Smith said White promptly joined him and, while they were waiting

-4-

on the defendant, they found the victim's white Cadillac in a garage behind the house. Smith testified he and White told the defendant to ask the victim for her car keys, and a few seconds later, the defendant instructed them the keys were by the back door. Smith stated that while he was in the house, he heard the defendant say to the victim, "Where's the f--king money at, bitch, or I'll kill you." Smith testified he heard the victim ask, "Why are you doing this?" while she was in the bathroom. Smith stated he did not enter the bathroom. He said that he and White returned to the victim's car with the keys and waited for the defendant.

Smith said he, the defendant, and White left in the Cadillac. Then they picked up Taylor at his grandmother's home, and the four of them went to another house where the defendant used a knife to cut a window screen, which allowed them to enter the house.

Albert Jackson testified his home was burglarized on November 27, 1999, while he was at work; when he returned home, he noticed a window screen was cut and a window was broken. Deputy David Ward of the Madison County Sheriff's Department found a knife on the ground under the broken window. Ward stated the knife blade was stained with blood. He described the blade as having "indentations" and being "serrated."

Margaret Bash, a forensic scientist with the TBI crime lab, testified that DNA testing showed the blood on the knife belonged to the victim. Bash further testified that no blood was found on the defendant's coat, and tests failed to reveal the presence of semen on vaginal and oral swabs taken from the victim.

The defendant, who was sixteen at the time of the offense, testified he was not at the victim's home and did not commit the offenses. He described in detail his activities of the day and night. According to the defendant, he spent the evening with Ande Braddock, Lee Coley, Patricia Coley, Guy Goodman, and Danny Wilson at Wilson's house, where they all remained until the following morning.

Lt. Donna Turner testified the defendant told her he was in a car with Ande Braddock, David Price, and a man named Chuck at the time of the offense. She also stated the defendant laughed when she showed him a photograph of the victim's injuries. The defendant testified that when he gave the statement to Lt. Turner, he was

mistaken about the date when he was in a car with Ande Braddock and David Price. He also denied laughing when Lt. Turner showed him a photograph of the victim.

Ande Braddock testified the defendant was with him from November 25 through November 28, 1999. According to Braddock, he and the defendant picked up Lee Coley and went to Danny Wilson's house where he and the defendant spent the night with Wilson, Lee Coley, Patricia Coley, and Guy Goodman, and they fell asleep watching movies sometime between midnight and 5:00 a.m. Braddock stated that Guy Goodman awoke them the following morning.

Vicki Braddock, Ande Braddock's mother, testified the defendant was with her son during the Thanksgiving weekend. She stated that on Friday, November 26, 1999, shortly before dusk, Ande Braddock and the defendant were at her home when they left to give a neighbor a ride home. She stated they returned a short time later. She said she also saw the defendant with her son the following afternoon. Robert Eguires testified he saw the defendant and Ande Braddock at a bar sometime between 5 p.m and 7 p.m. on Friday, November 26th. The defendant also presented the testimony of Lee Coley, Danny Wilson, Patricia Coley, and Guy Goodman corroborating that the defendant and Ande Braddock were with them at Danny Wilson's home at the time the offenses were committed. David Price testified he, Ande Braddock, and the defendant rode together in a car on Thanksgiving night.

April Kennon testified that in the early morning hours of Saturday, November 27, 1999, Jason White came to the hotel room she shared with her then boyfriend and current husband, Chris Kennon. She stated White arrived with some other individuals in a white Cadillac. She testified White had a knife with blood on it, that he said he cut a lady's throat twice because she did not have much money, and he thought the lady was dead. She stated White gave her some jewelry. She acknowledged that she had given a prior statement to law enforcement in which she said the defendant was in the white Cadillac.

The defendant also presented proof that none of the fingerprints lifted from the victim's gun cabinet or car matched the defendant's fingerprints, and that tests failed to reveal any fiber

-6-

transfers between the defendant's and the victim's clothing or other items.

 The jury found the defendant guilty of attempt to commit second degree murder, a lesser-included offense of attempt to commit first degree murder; three counts of aggravated rape; especially aggravated robbery; especially aggravated burglary; conspiracy to commit aggravated burglary; and misdemeanor vandalism. The trial court sentenced the defendant to an effective sentence of seventy-one years.

*State v. Joseph William Wilson*, No. W2001-03007-CCA-R3-CD, slip op. at 1-5 (Tenn. Crim. App., Jackson, Feb. 3, 2003). The defendant's judgments of conviction were affirmed on direct appeal, *id*., slip op. at 11, and the Tennessee Supreme Court denied permission to appeal on May 27, 2003.

 Slightly more than one year after the final action of the supreme court, the petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel. The petition was dismissed as time-barred, and that ruling was affirmed on appeal. *See Joseph W. Wilson v. State*, No. W2005-00808-CCA-R3-PC (Tenn. Crim. App., Jackson, Oct. 31, 2006).

 On May 27, 2005, the petitioner filed in Madison County Circuit Court a petition for post-conviction relief pursuant to the Post-Conviction DNA Analysis Act of 2001. *See* T.C.A. §§ 40-30-301 to -313 (2006). He asked in the petition that the evidence used against him at trial and in the investigation of the charges be submitted for DNA analysis. He itemized 18 pieces of evidence by reference to a Tennessee Bureau of Investigation ("TBI") Serology/DNA Report, a TBI Official Latent Fingerprint Report, and a Madison County Sheriff's Department Criminal Investigations Division Evidence Log, purported copies of which were attached to the petition. As grounds, the petitioner claimed that several items of evidence collected by the Madison County Sheriff's Department were sent to the TBI Crime Laboratory but were never tested for DNA or were not tested to determine the presence of the co-defendants' DNA. He further alleged that had "the jury . . . been presented with evidence that DNA analysis of the items in question had indicated the presence of just one, or more of the three co-defendants or anyone other than the Petitioner in the bathroom, where the rape had occurred[,] . . . there would be reasonable probability that the Petitioner would not have been convicted or prosecuted."

 The petitioner acknowledged in his petition that the lack of his DNA on the items "would not conclusively exclude him from being present and committing the crime," but he maintained that "the presence of another co-defendant's DNA would show impeachment of their testimony as to never going into the bathroom where the actual rape occurred." In the latter situation, the alleged exculpatory results, the petitioner conceded, "may not have resulted in a reasonable probability that [he] would not have been prosecuted," but such results would have created a reasonable probability that he "would not have been convicted."

The State filed a written response and a motion to dismiss. It asserted that the petitioner was prosecuted and convicted even though the rape kit collected from the victim was negative for the presence of semen and DNA, even though the blood on the knife used to cut the victim's throat tested positive only for the victim's DNA, and even though no blood was found on the petitioner's coat. The State also pointed out that the victim identified the petitioner as her attacker and that the testimony of co-defendants placed the petitioner at the scene and described his involvement in the rape and attempted murder. According to the State, the victim's identification negated any argument that the State would not have prosecuted the petitioner, and even if the co-defendants' DNA was detected on any evidence, that testing result "would only bolster the State's case that these individuals were where they were and saw what they said that they saw."

On March 13, 2006, the Madison County Circuit Court entered an order dismissing the post-conviction petition for DNA analysis, with the following explanation:

> In the instant case, the rape kit collected from the victim did not contain any DNA evidence to test. The knife used to cut the victim's throat was tested[] and DNA was found to match the victim's blood. Moreover, the primary evidence against the Petitioner was the victim's positive identification of the Petitioner as her attacker. In addition, the co-defendants involved in the rape and attempted murder testified for the State. It is clear that Petitioner's request meets none of the criteria set forth in [Code section 40-30-304].
>
> After reviewing the Petition, the evidence presented at trial and the applicable law, this Court has concluded that the Petition for relief pursuant to the Post-Conviction DNA Analysis Act of 2001 is without merit.

On appeal, the petitioner appears pro se. He maintains that the post-conviction court should not have summarily dismissed his petition for DNA analysis without appointing counsel to represent him and without an evidentiary hearing. He also contests the lower court's conclusion that he failed to meet the criteria required to obtain DNA analysis.

As we shall explain, we affirm the dismissal of the petition but on different grounds than relied upon by the post-conviction court.

The Post-Conviction DNA Analysis Act of 2001 applies only to certain enumerated felonies. They are: (1) first degree murder, (2) second degree murder, (3) aggravated rape, (4) rape, (5) aggravated sexual battery or rape of a child, (6) the attempted commission of any of these offenses, (7) any lesser included offense of these offenses, and (8) at the direction of the trial judge, any other offense. T.C.A. § 40-30-303 (2006). Consequently, of the petitioner's seven underlying judgments of conviction, only his three convictions of aggravated rape and one conviction of attempted second degree murder qualify for consideration pursuant to the Act. For these convictions,

-8-

the petitioner "may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution . . . that may contain biological evidence." *Id.*

The Act provides no statutory time limit and gives petitioners the opportunity to request analysis at "any time," whether or not such a request was made at trial. *Griffin v. State*, 182 S.W.3d 795, 799 (Tenn. 2006). A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304 (2006); *see also Griffin*, 182 S.W.3d at 798. Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when the petitioner meets the same conditions. T.C.A. § 40-30-305 (2006); *see also Griffin*, 182 S.W.3d at 798. In either instance, some physical evidence must be available and in a proper condition to enable DNA analysis. T.C.A. § 40-30-304(2) (2006).

A petitioner's failure to meet any of the qualifying criteria is fatal to the action. *William D. Buford v. State*, No. M2002-02180-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App., Nashville, Apr. 24, 2003). Moreover, the Act does not specifically provide for a hearing as to the qualifying criteria and, in fact, authorizes a hearing only after DNA analysis produces a favorable result. *See* T.C.A. § 40-30-312 (2006).

The post-conviction court has considerable discretion in determining whether to grant relief under the Act, and the scope of appellate review is limited. *See Sedley Alley v. State (Alley II)*, No. W2006-01179-CCA-R3-PD, slip op. at 7 (Tenn. Crim. App., Jackson, June 22, 2006). In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial and any stipulations of fact made by either party. *Id.* The lower court may also consider the opinions of this court and the Tennessee Supreme Court on direct appeal of

-9-

the petitioner's convictions or the appeals of the petitioner's prior post-conviction or habeas corpus actions. *Id*. On appellate review, this court will not reverse unless the judgment of the lower court is not supported by substantial evidence. *Id*.

In interpreting the scope of the Post-Conviction DNA Analysis Act of 2001, this court has ruled that the Act's reach "is limited to the performance of DNA analysis which compares the petitioner's DNA to . . . biological specimens gathered at the time of the offense." *Sedley Alley II*, slip op. at 11. In other words, the Act "does not authorize the trial court to order the victim to submit new DNA samples years after the offense, nor does the statute open the door to any other comparisons the petitioner may envision." *Id*. The Act, at most, creates "a limited interest of a defendant in establishing his/her innocence and [does] not create an interest in establishing the guilt of a speculative and unknown third party." *Id*.

In this case, the petitioner seeks DNA testing on the knife used to slash the victim's throat and on other items recovered from the victim's bathroom that were not tested. The purpose of the testing, the petitioner clearly asserts, is to determine if DNA results can be matched to any one of the three co-defendants; the petitioner is not seeking to ascertain if his DNA is detectable on any of the items. Therefore, in the first instance, the petitioner's request falls outside the Act's limited reach of comparing the petitioner's DNA to samples taken from biological specimens gathered at the time of the offense.

We are mindful that the petitioner is not attempting to launch a "speculative nationwide search for the possibility of a third party perpetrator." *See id*. Rather, he is seeking a DNA comparison to his three named co-defendants at the time of the original prosecution. A similar situation arose in *Donnie E. Johnson v. State*, No. W2006-02208-CCA-R3-PD (Tenn. Crim. App., Jackson, Mar. 22, 2007). In that case, the petitioner sought to compare DNA recovered from the crime scene with DNA samples taken from a named, potential accomplice at the time of the prosecution. The lower court denied the petition, and this court affirmed the ruling on appeal. The opinion recites in pertinent part:

> [I]t does not appear that the post-conviction court applied the holding in *Alley II*, referred to by the Petitioner as the *Alley II* Rule, in the present case. The post-conviction court distinguished the situation in *Alley II*, where petitioner sought to compare DNA samples found on certain evidence to DNA samples of unknown third parties, to the situation in the present case where the Petitioner seeks to compare recovered DNA with DNA samples taken from a potential accomplice at the time of the original prosecution, i.e., Ronnie McCoy. While the lower court acknowledged that the Post-Conviction DNA Analysis Act did not appear to permit the DNA to be compared to that of Ronnie McCoy, the court assumed that McCoy's DNA was available to be tested and that DNA analysis would show Ronnie McCoy's DNA on the garbage bag. The lower

-10-

court's presumptions were made with the acknowledgments that McCoy could not be forced to provide a new DNA sample and that it was not clear that the existing samples were in such condition for a comparison due to their age.

*Id*., slip op. at 7.

In this case, it is unnecessary for us to determine if the Act permits DNA analysis that compares samples taken from biological specimens gathered at the time of the offense to the DNA of known individuals, other than the petitioner. Even if such a comparison is authorized in an appropriate situation, the petitioner in this case does not allege, nor does the record indicate, that his co-defendants' DNA was among the biological specimens gathered at the time of the offense. The petitioner carefully itemized the evidence sought to be tested, and he attached to his petition copies of a TBI Serology/DNA Report, a TBI Official Latent Fingerprint Report, and a Madison County Sheriff's Department Criminal Investigations Division Evidence Log. We have reviewed those attachments, and assuming for the sake of argument that they are authentic, the only recovered blood samples listed are those of the defendant and the victim. We detect nothing in the language of the Act that authorizes a court to order an individual to provide a DNA sample.

Consequently, we hold that the Post Conviction DNA Analysis Act of 2001 does not authorize the relief sought by the petitioner in this case, and we affirm the post-conviction court's dismissal of the petition.

_____
JAMES CURWOOD WITT, JR., JUDGE